**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS,
TYLER DIVISION**

| | |
|---|---|
| KERRY MAX COOK, | |
| Plaintiff, | Case No. |
| v. | JURY TRIAL DEMANDED |
| COURTNEY LYSSY as Third-Party Successor Temporary Dependent Administrator for the ESTATE OF GEORGE DOUGLAS COLLARD and the ESTATE OF RONALD SCOTT MALLOCH, and CITY OF TYLER, TEXAS, | |
| Defendants. | |

## COMPLAINT

Plaintiff Kerry Max Cook, by his attorneys Loevy + Loevy, complains against

Defendants Courtney Lyssy as Third-Party Successor Temporary Dependent Administrator for

the Estate of George Douglas Collard and Estate of Ronald Scott Malloch and the City of Tyler,

Texas as follows:

### INTRODUCTION

1.      These are the words of the Texas Court of Criminal Appeals, finding Plaintiff

Kerry Max Cook innocent of a 1977 murder Cook has spent 47 years fighting: **"[W]hen it

comes to solid support for actual innocence, this case contains it all—uncontroverted *Brady*

violations, proof of false testimony, admissions of perjury, and new scientific evidence."**

2.      Kerry Max Cook was wrongfully arrested, charged, prosecuted, and convicted of

the brutal rape and murder of 21-year-old Linda Jo Edwards. The crime occurred in Tyler, Texas

in 1977.

3.      Plaintiff was completely innocent.

4.      He was convicted not based on evidence, but because of a homosexual witch-hunt by police investigators.

5.      In service of their witch-hunt, former City of Tyler police officers George Douglas Collard and Ronald Scott Malloch, and other police investigators actively and systematically disregarded, downplayed, and concealed obvious evidence pointing to the victim's 44-year-old married, disgruntled ex-lover, James Mayfield, after investigators determined Mayfield was married and not homosexual.

6.      Ample evidence available and provided to Defendants from the early days of the investigation implicated Mayfield as Edwards' killer: Edwards' roommate reported that on the night of the murder, she saw Mayfield in the room where Edwards' body was found the next morning; Mayfield had just been fired from his job at a prominent university because of his extramarital affair with Edwards, who was a secretary at the university; Mayfield was reported to have possessed, before the crime, a law enforcement treatise on sex crimes containing examples of sexual mutilation similar to the wounds inflicted on Edwards; and after the crime, Mayfield was reported to have been asking how to beat a polygraph test.

7.      Rather than follow the evidence, Collard, Malloch, and other investigators created a sham psychological profile of the killer as a homosexual man—fueled by bigotry rather than evidence—and set out to pin the murder on a gay suspect. Believing Plaintiff was gay, police made him their target.

8.      There has never been credible evidence implicating Plaintiff in Edwards' killing: the blood, hair, and DNA at the scene didn't tie to Plaintiff, and the one eyewitness named Mayfield as the killer.

2

9.      As a result, Malloch and Collard, acting with other officers, fabricated evidence to make their case. They manufactured a false fingerprint analysis, coerced false statements and testimony from witnesses—including jailhouse informants—and knowingly created recklessly false investigative materials.

10.     In addition, to ensure Plaintiff was convicted despite his innocence, Collard and Malloch concealed crucial exculpatory evidence.

11.     As a result of that misconduct, Plaintiff spent more than 20 years in prison, nearly all of them on death row.

12.     There he endured unimaginable horrors, including repeated sexual abuses, that changed him forever. After his release, he struggled for another 25 years to clear his name.

13.     Ultimately, the criminal case against Plaintiff fell apart.

14.     Decades after Plaintiff's conviction, DNA testing conclusively established that Mayfield's semen and skin were on the victim's underwear when she was murdered. Mayfield later admitted he had lied under oath in Plaintiff's criminal case for nearly 40 years about his interactions and relationship with Edwards in the days before her death.

15.     On June 6, 2016, a Texas trial court recommended that Plaintiff's conviction be vacated based on violations of his constitutional rights.

16.     And on June 19, 2024, the Texas Court of Criminal Appeals set aside Plaintiff's conviction, finding that Plaintiff's due process rights had been violated and Plaintiff was actually innocent.

17.     Despite all the evidence implicating him, Mayfield was never prosecuted or convicted.

18.     Plaintiff now seeks justice for the harm the defendants caused and redress for the

loss of liberty and horrific hardship he endured over the last five decades and continues to suffer because of police investigators' egregious misconduct.

## JURISDICTION AND VENUE

19.     Plaintiff brings this case under 42 U.S.C. § 1983 to redress Collard's and Malloch's tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

20.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

21.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resided in this judicial district at the relevant times and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

22.     Plaintiff Kerry Max Cook spent over two decades in prison—nearly all of them on death row—for a crime he did not commit.

23.     Ronald Scott Malloch is the former Chief of the Tyler Police Department involved in supervising and conducting the Edwards murder investigation.

24.     At relevant times, Malloch was the final policymaking authority for the Tyler Police Department.

25.     Malloch died on December 10, 1978.

26.     On November 5, 2025, the Smith County, Texas probate court appointed Courtney Lyssy as the Third-Party Successor Temporary Administrator for the Estate of Ronald Scott Malloch and issued Letters of Temporary Dependent Administration for Ms. Lyssy.

27.     The probate court ordered, adjudged, and decreed that Successor Temporary

4

Dependent Administrator Lyssy shall have the power to represent the Malloch Estate regarding any and all claims alleged under Case No. 6:17-cv-333-JDK, *Cook v. Tyler*, in the United States District Court for the Eastern District of Texas, Tyler Division; and to execute all documents necessary to participate in, settle, compromise, or otherwise resolve that litigation.

28. On May 28, 2026, the probate court entered an order extending the term of Lyssy's appointment until the conclusion of that civil case and all related matters. Ms. Lyssy is authorized to act on the Estate's behalf in any legal proceeding in the United States District Court for the Eastern District of Texas, Tyler Division arising from the facts alleged in Case No. 6:17-cv-333.

29. George Douglas Collard is a former officer of the City of Tyler Police Department involved in supervising and conducting the Edwards murder investigation.

30. Collard died on March 22, 2015.

31. On November 5, 2025, the Smith County, Texas probate court appointed Courtney Lyssy as the Third-Party Successor Temporary Administrator for the Estate of George Douglas and issued Letters of Temporary Dependent Administration for Ms. Lyssy.

32. The probate court ordered, adjudged, and decreed that Successor Temporary Dependent Administrator Lyssy shall have the power to represent the Collard Estate regarding any and all claims alleged under Case No. 6:17-cv-333-JDK, *Cook v. Tyler*, in the United States District Court for the Eastern District of Texas, Tyler Division; and to execute all documents necessary to participate in, settle, compromise, or otherwise resolve that litigation.

33. On May 28, 2026, the probate court entered an order extending the term of Lyssy's appointment until the conclusion of that civil case and all related matters. Ms. Lyssy is authorized to act on the Estate's behalf in any legal proceeding in the United States District

5

Court for the Eastern District of Texas, Tyler Division arising from the facts alleged in Case No. 6:17-cv-333.

34.    At all relevant times, Malloch and Collard were employees of the City of Tyler, Texas.

## FACTS

### Linda Jo Edwards and James Mayfield's Affair

35.    In 1977, 21-year-old Linda Jo Edwards was working as a secretary at Texas Eastern University, where 44-year-old James Mayfield was Dean of Learning Resources.

36.    Mayfield was married and had three children.

37.    But Mayfield and Edwards were secretly involved in a long-term extramarital affair.

38.    In the spring of 1977, Mayfield left his wife and children and moved with Edwards to a rental apartment at the Embarcadero Apartments complex in Tyler, Texas.

39.    After only a few days living with Edwards, Mayfield returned to his wife, after which Edwards attempted suicide.

40.    Mayfield asked a subordinate colleague from the university, Paula Rudolph, who also lived in the Embarcadero Apartments, to take Edwards in while she recovered.

41.    Thereafter, Mayfield and Edwards' affair became public.

42.    As a result, Mayfield was fired from his job, and his marriage was in trouble.

43.    But Mayfield could not stay away from Edwards and kept returning to their volatile relationship.

**The Rape and Murder of Linda Jo Edwards**

44.    On June 9, 1977, Edwards was living at the Embarcadero in Rudolph's apartment. Edwards and Rudolph each had their own room in the apartment.

45.    Rudolph had gone out for drinks around 10:30 p.m.

46.    At some point between 10:30 p.m. on June 9, 1977, and 12:30 a.m. on June 10, 1977, a man came into the apartment without forcing entry and brutally raped, murdered and mutilated Edwards.

47.    Edwards was struck in the head with a statue, stabbed repeatedly with a knife and scissors, and her body was viciously mutilated. It was a gruesome murder.

48.    When Rudolph walked in the apartment door at 12:30 a.m., she saw James Mayfield in Edwards' room.

49.    Rudolph knew Mayfield well because he was her boss at the university.

50.    Rudolph told Mayfield, "Don't worry it's only me," and she went straight to bed.

51.    Within a few minutes, without hearing any cries or commotion, Rudolph heard a person leave the apartment. A short time later, she fell asleep.

52.    The next morning, Rudolph found the patio door in the apartment open. She went into Edwards' room and found Edwards' body.

53.    The murder weapons—a knife, statue, and pair of scissors—were at the scene.

**Law Enforcement Officials Investigate the Crime**

54.    Officers from the Tyler Police Department and other agencies responded to the scene and investigated the crime.

55.    Chief of the Tyler Police Department, Ronald Scott Malloch and Sergeant George Douglas Collard led the investigation.

56.     On information and belief, Malloch and Collard oversaw every aspect of the investigation and kept themselves informed of all the evidence and investigative leads developed by Tyler Police Department officers under their supervision over the years, including officers Gerald Hayden, Eddie Clark, and Eric Liptak.

57.     The Texas Department of Public Safety collaborated with the Tyler Police Department on the Edwards homicide investigation.

58.     The Smith County Sheriff's Department also collaborated with the Tyler Police Department on the Edwards homicide investigation.

59.     As leaders of the Edwards homicide investigation, Malloch and Collard, on information and belief, also were informed of evidence and investigative leads developed by the law enforcement officials and departments with whom the Tyler Police Department collaborated on the investigation.

60.     Rudolph described the man she saw in Edwards' room to police investigators as sleek and slender, with a tan and medium-length silver hair that touched his ears. She said he was wearing white shorts.

61.     That description perfectly matched Mayfield, who was known to wear white tennis clothes.

62.     Investigators also learned of Mayfield and Edwards' affair and his subsequent firing from the university.

63.     And investigators obtained evidence pointing to additional suspects.

64.     Within the first few days of investigating, however, officers committed themselves to the false and discriminatory idea that the gruesome nature of the attack meant the perpetrator was a "deviant homosexual."

65. Neither Mayfield nor any other male suspect the police knew of was gay.

**Kerry Max Cook**

66. In the first days of August 1977, two months after the crime, while police were canvassing the Embarcadero complex for homosexual men, Plaintiff Kerry Max Cook came across their radar.

67. Police became convinced Plaintiff was homosexual, in part because he had spent time working at gay nightclubs in Dallas and had been temporarily staying with a gay acquaintance at the apartment complex.

68. At the time of the murder, Plaintiff was 21 years old. He had grown up as an "army brat" with his father in the U.S. Army stationed overseas.

69. After his father's retirement from the military in 1973, his family moved from Fort Hood in Killeen, Texas to Jacksonville, Texas, where they opened a restaurant.

70. Plaintiff had spent the last few years working in various cities as a bartender.

71. In early June, he came to Tyler and found temporary lodging with an acquaintance, James Taylor, at the Embarcadero Apartments, while looking for work.

72. Police learned that Plaintiff had met Edwards at the apartment complex pool earlier in the week before she was killed. At least three witnesses told police that Edwards had invited Plaintiff into her apartment the day they met, a few days before she was found dead.

73. When police questioned Plaintiff about Edwards' murder, he told them he had nothing to do with it.

74. Plaintiff also told police he had an alibi: he had spent the day with James Taylor's nephews and the evening with a friend of Taylor's named Robert Hoehn.

75. Plaintiff told police that he and Hoehn were together in the apartment and later

9

went to buy cigarettes at the very time the murder was taking place.

76.    The police had ample additional evidence that Plaintiff was innocent.

77.    Plaintiff did not match Paula Rudolph's description of the perpetrator: Plaintiff had shoulder-length, dark brown hair that covered his ears. Moreover, multiple witnesses had reported that on the night of the murder, Plaintiff was wearing blue and red swim trunks and put blue jeans over them when he went to the store with Hoehn.

78.    With nothing to hide, Plaintiff gave police permission to search his car and apartment. They found no evidence whatsoever connecting him to the crime.

79.    Nevertheless, fueled by their homophobic agenda, police focused on Plaintiff as a suspect.

80.    Not surprisingly, as he'd been a guest at Edwards' days before the murder, police found Plaintiff's fingerprints on a glass sliding door in the common area of Edwards and Rudolph's apartment.

81.    But they found no physical evidence connecting Plaintiff to the crime: his fingerprints were not in Edwards' bedroom—the scene of the crime—nor were they on the murder weapons. Even a foreign hair found on the victim's body was tested, and Plaintiff was excluded as the source.

82.    Though they knew the actual, innocent reason Plaintiff's fingerprints were on the sliding door, Collard and Malloch seized on those fingerprints to frame Plaintiff for the murder based on their "profile" of the killer as a gay man and their belief Plaintiff was gay.

### Police Steer the Investigation Away from the Obvious Suspect

83.    In pursuing their vendetta against Plaintiff, the police turned the investigation away from the obvious suspect: Edwards' ex-boyfriend, James Mayfield.

10

84.     Numerous leads pointed to Mayfield.

85.     For one, Rudolph saw Mayfield in Edwards' room on the night of the murder. The next morning, after calling the police, Rudolph told multiple people she'd seen James Mayfield.

86.     Moreover, Mayfield had a motive: Edwards' suicide attempt had publicly exposed their affair. As a result, Mayfield had just been fired from Texas Eastern University, his marriage was falling apart, and one of his daughters, Louella Mayfield, was becoming emotionally unraveled.

87.     Malloch, the Chief of the Tyler Police Department knew that, in the days after the murder, Mayfield had failed multiple polygraph tests.

88.     Malloch also knew that Mayfield asked a colleague at Texas Eastern University for advice shortly after the murder about how to beat a polygraph.

89.     Malloch further knew that Mayfield had been seen with a law enforcement treatise containing graphic depictions of sexual mutilation like the injuries the killer inflicted on Edwards.

90.     And police had additional evidence pointing to the Mayfield family.

91.     Police learned that just two weeks before the murder, Mayfield's daughter, Louella Mayfield, had been going to apartments around Tyler identifying herself as a Tyler police officer and saying she was investigating a murder involving James Mayfield and Linda Jo Edwards.

92.     In addition, days before the murder, Louella had gone to Texas Eastern University and threatened to kill Edwards because of her affair with Louella's father.

93.     Collard's and Malloch's colleague at the Tyler Police Department, Gerald Hayden wrote in a police report that Louella was "mentally and emotionally unstable, very hyper, and a

11

pathological liar."

94. What's more, the team investigating the Edwards murder searched Louella Mayfield's car and found, in the trunk, a pair of wet blue jeans with a green substance and stains on the bottom, which they took into their custody. Meanwhile, police had discovered a "mysterious green leafy substance" in Edwards' closet next to where they found the knife used in the murder.

95. To frame Plaintiff, the police concealed evidence pointing to Mayfield and his family.

96. For example, Malloch concealed from prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys reports of the witness interviews and statements containing information about Mayfield's effort to beat the polygraph and his possession of the treatise.

97. Likewise, Hayden and his colleagues concealed the report in which he noted that Louella Mayfield was unstable.

98. The investigative team also concealed evidence that they knew Mayfield was lying when he told police he had not seen Edwards in weeks before her killing, and they suppressed or destroyed reports of various witness interviews and statements linking Mayfield and Edwards soon before the murder.

99. Police under Malloch's and Collard's supervision also tampered with Paula Rudolph's identification of Mayfield as Edwards' killer.

100. Rudolph told Tyler Police Department officers Eddie Clark and Nelson Downing that she saw Mayfield at the crime scene.

101. But officers prepared a witness statement for Rudolph to sign excluding that crucial fact. Instead, they coerced Rudolph into signing a statement saying she "assumed" the

12

person she saw was Mayfield.

102.    In his report of the Rudolph interview, dated June 13, 1977, after the investigative team Malloch and Collard were leading had committed to pinning the murder on a gay man, Clark left out James Mayfield's name and every aspect of Rudolph's description of the person she saw in Edwards' room that matched James Mayfield.

103.    Over the ensuing weeks, the investigative team coerced Rudolph into entirely disavowing her statement that she saw Mayfield, and instead falsely pointing the finger at Plaintiff, without disclosing anything about their actions to procure this false testimony.

104.    What's more, other witnesses reported to the investigative team that Rudolph had said the person she saw was Mayfield. The investigative team members did not disclose their reports of those interviews, instead suppressing or destroying those reports so they were not available to Plaintiff at trial.

105.    In addition, the investigative team improperly destroyed biological evidence that likely would have inculpated Mayfield in the crime and exculpated Plaintiff.

106.    One such piece of key evidence was a hair with a bloody root found on Edwards' buttocks during her autopsy. The potentially exculpatory value of the hair sample was apparent: police knew the hair was likely to have come from Edwards' killer.

107.    The police sought to have the hair tested. But they failed to disclose any results from that testing before they singled out the hair among other physical evidence in the case and asked for it to be destroyed.

108.    Collard, Clark, and others caused the hair sample to be destroyed without allowing Plaintiff the opportunity to have it tested. They did this in bad faith, without authorization, and in violation of applicable Texas law.

13

**Police Conceal Numerous Other Leads**

109.    In addition to ignoring the many leads pointing to James Mayfield, the investigative team downplayed, suppressed, or destroyed leads pointing to potential suspects that did not fit their predetermined profile of the killer.

110.    One such suspect was Greg Smith, who was visiting friends at the Embarcadero apartment complex the night of the murder.

111.    Edwards joined Smith and his friends from approximately 10:00 pm to 10:25 pm and then informed them she was going back to her apartment and would be there alone.

112.    Investigators learned that Smith watched Edwards walk back to her apartment, and then he stayed at his friends' apartment until before midnight, when he left alone.

113.    Smith, like the person Rudolph described seeing in Edwards' room later that night, was wearing white tennis shorts.

114.    Marvin McLeroy was an employee of the Texas Department of Public Safety collaborating with the Tyler Police Department on the Edwards homicide investigation.

115.    McLeroy administered a polygraph examination on Smith that showed Smith lied when he denied knowing who killed Linda Jo Edwards.

116.    McLeroy and Tyler Police Department officer Eddie Clark, together with the other investigators, deliberately concealed this evidence from prosecutors, Plaintiff, and his criminal defense attorneys.

117.    Instead, investigators fabricated a false narrative that Smith had been cleared as a suspect.

**Police Frame Kerry Max Cook**

118.    With no evidence against Plaintiff and a mountain of compelling evidence against

14

James Mayfield and other suspects, the investigative team lacked probable cause to arrest Plaintiff for the Edwards murder.

119.    Investigators therefore set out to manufacture false evidence to frame Plaintiff, while concealing that their manufactured evidence was false.

120.    Police also improperly coerced, encouraged, and manipulated witnesses to falsely implicate Plaintiff in the crime, without disclosing anything about their actions to procure this false testimony.

121.    And independent of the serious misconduct described above, investigators repeatedly and deliberately withheld evidence that further demonstrated Plaintiff's innocence.

### False Fingerprint Evidence

122.    First, Collard, in collaboration with Clark and other officers under his supervision, advanced the bogus claim that Plaintiff's fingerprints on the apartment sliding door were only hours old when Collard lifted them at 9 a.m. on June 10, 1977.

123.    That is, Collard claimed to know that Plaintiff's fingerprints were left on Edwards' apartment door right around the time of her murder.

124.    The investigative team fabricated this claim to falsely rule out the possibility that Plaintiff left his prints on the door days before the murder when, as at least three witnesses had told police, Edwards had invited Plaintiff to her apartment.

125.    Years later, Collard admitted that he knew when he first offered the opinion that there was no sound, supported basis in forensic science for it.

126.    Indeed, as Collard was aware, Federal Bureau of Investigation experts have explained that it is scientifically impossible to offer opinions like the one Collard conjured.

127.    Yet, the investigative team concealed from prosecutors, Plaintiff, and Plaintiff's

15

criminal defense attorneys documents and information showing the fingerprint evidence was fabricated.

128.    At the same time Collared was concocting a bogus opinion to link Plaintiff's fingerprints to the time of the murder, investigators were working to conceal evidence of the fingerprints' innocent source.

129.    Three witnesses—Plaintiff's host, James Taylor, and Taylor's nephews Randy and Rodney Dykes—told police that Plaintiff and Edwards had a romantic encounter at Edwards' apartment a few days before the murder.

130.    Members of the investigative team withheld their notes containing that information.

131.    Investigators then improperly manipulated those witnesses—including 17-year-old Randy Dykes and 12-year-old Rodney Dykes—into giving false testimony at Plaintiff's trials.

132.     Police concealed this manipulation too, and they suppressed or destroyed records reflecting the manipulation.

### *False Evidence of Plaintiff's "Confession"*

133.    To bolster their case against Plaintiff, investigators recruited individuals to give false evidence implicating Plaintiff in the murder.

134.    Some of these individuals agreed to falsely report that Plaintiff had confessed to them, when, in fact, no such confessions ever occurred.

135.    A particularly egregious example is investigators' recruitment of jailhouse snitch Edward "Shyster" Jackson to offer the completely fabricated claim that Plaintiff confessed to him and made other inculpatory statements.

136.    Investigators coerced Jackson into giving a fabricated statement, and then they pursued a series of coercive and threatening acts against Jackson to ensure he would falsely testify against Plaintiff.

137.    Among other things, McLeroy administered multiple polygraph examinations of Jackson, which revealed that Jackson was being deceptive about the supposed confession. Jackson then admitted to McLeroy he was lying.

138.    McLeroy and the other investigators under Malloch's and Collard's supervision, and, on information and belief, with their knowledge, deliberately concealed the results of the polygraph tests that Jackson failed and concealed Jackson's statements admitting he was lying.

139.    Investigators drugged Jackson with valium so he would pass a third polygraph test as part of their effort to fabricate out of whole cloth a false "confession" from Plaintiff.

140.    After Jackson later recanted his false testimony against Plaintiff and admitted to being coerced and pressured, police beat him to the point of breaking his arm.

141.    Police took those violent and threatening acts to prevent Jackson from coming forward about the falsity of his original testimony and about the police misconduct.

142.    Police concealed documents and information about fabricating the Jackson evidence.

143.    Jackson is merely one example. There were other jailhouse snitches and witnesses the investigative team recruited and caused to provide false evidence implicating Plaintiff in the crime, all while knowing that these statements were entirely false.

144.    To procure this false testimony, investigators made improper, undisclosed promises and offered impermissible incentives to these individuals, and they coerced others to tell lies.

17

145.    In another instance, investigators fabricated an entirely false and incredible "confession" through sheriff's deputy Robert Wickham, who escorted Plaintiff though the courthouse during his criminal proceeding.

146.    Wickham, a friend of Smith County Sheriff J.B. Smith, worked with Tyler Police Department officer Eric Liptak, to create false documents claiming that years earlier, Plaintiff confessed Edwards' murder to Wickham when the two were alone in a courthouse elevator.

147.    Liptak communicated this false information to the prosecutor's office before Plaintiff's trial, and the fabricated confession was one of the bases upon which the prosecutor pursued the false case against Plaintiff.

148.    Through the actions described above and others, the investigative team, under Malloch's and Collard's supervision and, on information and belief, with their knowledge, produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file.

149.    These documents contained statements and described events investigators fabricated and knew were false.

150.    Police prepared and signed off on these reports, both as investigators and as supervisors, despite knowing the information in the reports was entirely false.

151.    The information in the documents became evidence in the case against Plaintiff, and it was used to show Plaintiff's purported connection to the crime.

152.    Investigators concealed the misconduct described above from Plaintiff, his criminal defense attorneys, and the prosecutors involved in his criminal case.

153.    Information about investigators' actions to obtain false testimony from witnesses would have been powerful evidence of Plaintiff's innocence.

18

154. Plaintiff could also have used the information to impeach investigators and witnesses who testified falsely against him at his trial.

155. Investigators' misconduct also deprived Plaintiff of evidence that would have pointed toward the person who had actually committed the crime.

156. Malloch and Collard, on information belief, knew officers under their supervision and with whom their department collaborated fabricated evidence against Plaintiff and engaged in misconduct to frame Plaintiff and continue his prosecution.

157. They nevertheless intentionally ignored and approved investigators' misconduct and decided to frame Plaintiff for a crime he did not commit rather than directing the officers under their supervision to find the person who raped and killed Linda Jo Edwards.

### The City of Tyler's and Smith County's Policy and Practice of Wrongly Convicting Innocent People in Violation of the Constitution

158. The City of Tyler is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of criminal cases like Plaintiff's case.

159. In the mid-1970s, during the years leading up to and after the Edwards murder, law enforcement officials working for the City of Tyler operated under an unwritten policy to rid the County of "undesirable" citizens, including LGBT people, by fabricating evidence to implicate those people in crimes they did not commit.

160. In 1979, for example, convictions involving over 100 defendants in drug-related cases were thrown out after it came to light that Tyler Police Department officers fabricated false evidence and/or suppressed exculpatory evidence to cause convictions in violation of the individuals' civil rights.

161. In many of those cases, Tyler police officers used the same tactics investigators employed against Plaintiff in this case, including fabricating evidence and concealing

19

exculpatory evidence to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

162.    Indeed, two of the officers involved in those wrongful convictions later admitted that they framed the individuals for drug crimes at the behest of their superiors at the department, who instructed the officers to plant evidence.

163.    The City of Tyler knew about this widespread practice of fabricating evidence and suppressing exculpatory information long before the events at issue in this case.

164.    Before and during the period when Plaintiff was falsely charged and convicted, the City of Tyler also operated a dysfunctional disciplinary system for law enforcement officers accused of serious misconduct.

165.    The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

166.    For example, one of the officers admittedly involved in planting evidence on drug suspects in the mid-to-late 1970s, Kim Wozencraft, has publicly acknowledged that a code of silence existed within the Tyler Police Department at that time, which was condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including misconduct like that at issue in this case.

167.    As a result of the City of Tyler's established practices, officers (including the officers who investigated the Edwards homicide) came to believe they could violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse

circumstances.

168.    The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the law enforcement agencies. As a result of those policies and practices of the City of Tyler, members of law enforcement acted with impunity when they violated the constitutional and civil rights of citizens.

169.    The City of Tyler also failed in the years before Plaintiff's wrongful conviction to provide adequate training to law enforcement officials in many areas, including the following:

    a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding.

    b.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

    c.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

    d.    The risks of engaging in tunnel vision during investigation.

    e.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

170.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

171.    The City's failure to train, supervise, and discipline its officers, including the officers who investigated the Edwards homicide, condones, ratifies, and sanctions the kind of misconduct that investigators committed against Plaintiff.

172.    The City of Tyler and final policymaking officials within the Tyler Police Department failed to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

173.    The policies and practices described in the foregoing paragraphs were also approved by the City's policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

**Plaintiff's Wrongful Conviction and Imprisonment**

174.    Though Plaintiff was innocent of the murder, and Defendants had no legitimate evidence implicating him, on August 4, 1977, Clark swore out an affidavit to arrest and charge Plaintiff with Edwards' rape and murder.

175.    In his affidavit, Clark included the knowingly false, fabricated claim that Collard had determined Plaintiff's fingerprints were left at the time of the murder. He also falsely swore out portions of the affidavit discussing Paula Rudolph's statement, omitting that she initially identified the perpetrator as James Mayfield.

176.    As a direct result of investigators' misconduct, Plaintiff was falsely arrested, charged, and tried for the Edwards murder.

177.    In 1978, Plaintiff was wrongfully convicted of capital murder and sentenced to death for a crime he did not commit.

178.    Plaintiff spent more than two decades fighting for his life from a prison cell on death row, and he lived branded as a rapist and deviant homosexual murderer for almost four decades.

179.    Without investigators' extreme misconduct described above, Plaintiff would never have been arrested, prosecuted, or convicted.

**Plaintiff's Exoneration**

180.    On June 6, 2016, a Texas trial court judge recommended that Plaintiff's conviction be vacated.

181.    Smith County prosecutors agreed to throw out the conviction and charges against Plaintiff in part because James Mayfield had recently admitted for the first time that he had sex with Edwards the day before her murder, and he had given false and perjurious testimony at Plaintiff's trial. The prosecutors admitted that Plaintiff's constitutional due process rights had been violated.

182.    On June 19, 2024, the Texas Court of Criminal Appeals granted Plaintiff's request to set aside his conviction, and it declared him innocent of Linda Jo Edwards' rape and killing.

183.    On October 2, 2024, a Texas court ordered the indictment to be dismissed, and after 47 years, Kerry Max Cook was finally free.

184.    Plaintiff's four-decade legal battle was finally over, but the wounds from his fight for his life will never heal.

185.    Plaintiff's whole life was turned upside down with no warning when investigators focused their attention on him. Plaintiff's 20s, 30s, 40s, 50s, and into 60s—the vast majority of his life—were consumed by the horror of his persecution, wrongful prosecution, and imprisonment.

186.     Because of Collard's and Malloch's misconduct, Plaintiff was taken away from his family and friends. He missed out on all the profound moments of their lives. Plaintiff lost the familial and social relationships and shared experiences that are the centerpiece of every person's ability to experience joy and meaning. And upon his release, those relationships were unsalvageable due to death and the passage of time.

187.     Plaintiff was stripped of his young and middle adulthood. He was deprived of opportunities to gain an education, engage in meaningful labor, develop a career, and pursue his interests and passions.

188.     Indeed, Plaintiff was deprived of all the basic pleasures of human experience that free people enjoy as a matter of right, including the freedom to live his life as an autonomous human being.

189.     During more than two decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prison. His ordeal can only be described as a horror.

190.     Plaintiff fell to the mercy of a brutal prison environment having been labeled a sexual deviant and convicted of violently raping and murdering a young woman. Prisoners exacted their own revenge. Plaintiff was raped, sodomized, and violently attacked dozens of times, sometimes in gang fashion.

191.     Moreover, because Plaintiff had been sentenced to death, he lived every day with the fear that the State of Texas would one day execute him for a crime he did not commit.

192.     In addition to the severe trauma of wrongful prosecution and imprisonment and Plaintiff's loss of liberty, Collard's and Malloch's misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep

24

depression, despair, anger, and other physical and psychological effects.

## COUNT I
### 42 U.S.C. § 1983 – Violation of Due Process
### (Against Defendants Malloch and Collard)

193.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

194.   As described above, Malloch and Collard, while acting individually, jointly, and together with other investigators, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

195.   In the manner described more fully above, Malloch and Collard deliberately withheld exculpatory and impeachment evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

196.   In addition, Malloch and Collard fabricated and solicited false evidence, including testimony that they knew to be false and perjured and fabricated police reports implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence they knew was false when it was used against Plaintiff at his criminal trial.

197.   Malloch and Collard also concealed and fabricated additional evidence that is not yet known to Plaintiff.

198.   Malloch's and Collard's misconduct directly resulted in Plaintiff's unjust criminal conviction, thereby violating Plaintiff's right to a fair trial guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution.

199.   Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

200.   The misconduct described in this Count was objectively unreasonable and was

25

undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

201. As a result of Malloch's and Collard's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT II
### 42 U.S.C. § 1983 – Illegal Detention/Malicious Prosecution
### (Against Defendants Malloch and Collard)

202. Plaintiff incorporates each paragraph of this pleading as if fully restated here.

203. In the manner described above, the Malloch and Collard, while acting individually, jointly, together with other investigators, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to unreasonably seize him and initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

204. Through their misconduct, Malloch and Collard caused Plaintiff to be unreasonably seized without probable cause during the entirety of his wrongful prosecution and conviction.

205. Through their misconduct, Malloch and Collard accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so despite knowing Plaintiff was innocent.

206. Based on the above, Malloch and Collard maliciously caused Plaintiff to be unreasonably seized and subjected improperly to judicial proceedings, resulting in injury.

26

207.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

208.    The proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

209.    The State of Texas does not provide an adequate post-deprivation state tort remedy for the more than two decades of wrongful incarceration Plaintiff suffered from his illegal detention and malicious prosecution. This includes but is not limited to the fact that the Texas Tort Claims Act absolutely immunizes governmental employees such as Malloch and Collard, acting within the scope of their employment, and it absolutely immunizes governmental units from suit for intentional torts, including false arrest and malicious prosecution.

210.    As a result of the Malloch's and Collard's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT III**
**42 U.S.C. § 1983 – Destruction of Evidence**
**(Against Defendants Malloch and Collard)**

211.    Plaintiff incorporates each paragraph of this pleading as if fully restated here.

212.    In the manner described more fully above, Collard and police investigators under his and Malloch's supervision destroyed evidence that Plaintiff could have used to prove his innocence.

213.    The exculpatory value of that evidence was apparent. In the alternative, the evidence was potentially exculpatory, and Defendants knew that.

27

214. Nonetheless, Defendants negligently destroyed the evidence. In the alternative, Defendants acted in bad faith in destroying the evidence.

215. The evidence had unique evidentiary value, and Plaintiff could not obtain comparable evidence by any other means.

216. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Plaintiff's constitutional rights.

217. As a result of Collard's and Malloch's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Deprive of Constitutional Rights
### (Against Defendants Malloch and Collard)

218. Plaintiff incorporates each paragraph of this pleading as if fully restated here.

219. After Edwards' murder, Malloch and Collard, acting in concert with other co-conspirators, known and unknown, reached an agreement with each other and among the investigators who they supervised and with whom they collaborated on the Edwards homicide investigation to frame Plaintiff for a crime he did not commit and thereby deprive him of his constitutional rights, all as described in this pleading.

220. In so doing, these individuals conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of these rights.

221. In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

222.　The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

223.　As a result of Malloch's and Collard's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT V**
**Local Law Claim – Indemnification**
**(Against Defendant City of Tyler)**

224.　Plaintiff incorporates each paragraph of this pleading as if fully restated here.

225.　The City of Tyler must pay any tort judgment for damages rendered against Malloch and/or Collard in accordance with the City of Tyler Ordinances and any predecessors.

226.　Malloch and Collard were employees, members, and agents of the City of Tyler, acting at all relevant times within the course and scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Kerry Max Cook, respectfully requests this Court enter a judgment in his favor and against Defendants Courtney Lyssy as Third-Party Successor Temporary Dependent Administrator for the Estate of George Douglas Collard and the Estate of Ronald Scott Malloch and the City of Tyler awarding compensatory damages, attorneys' fees and costs against each defendant and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Kerry Max Cook hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 17, 2026

Respectfully submitted,

KERRY MAX COOK

By: /s/ *Jon Loevy*
*One of Plaintiff's Attorneys*

Jon Loevy (Illinois Bar No. 6218254)
Mike Kanovitz (Illinois Bar No. 6275233)
Roshna Bala Keen (Illinois Bar No. 6284469)
Anand Swaminathan (Illinois Bar No. 6305088)
Alison R. Leff (Illinois Bar No. 6296422)
(*pro hac vice motions forthcoming*)
LOEVY + LOEVY
311 N Aberdeen St, 3rd Fl
Chicago, IL 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)
jon@loevy.com